**DAVID H. ANGELI**, OSB No. 020244
david@angelilaw.com
**MICHELLE KERIN**, OSB No. 965278
michelle@angelilaw.com
**AMY E. POTTER**, OSB No. 231794
amy@angelilaw.com
**AMANDA A. THIBEAULT**, OSB No.132913
amanda@angelilaw.com
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Ricky Lane Snodgrass*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF OREGON<br><br>vs.<br><br>RICKY LANE SNODGRASS<br><br>Defendant. | Case No. 6:24-cr-00100-HL<br><br>**MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)(2)**<br><br>**Oral Argument Requested** |

Defendant Ricky Lane Snodgrass, an employee of the United States Forest Service ("Forest Service"), oversaw a prescribed fire or burn that the Forest Service conducted on federal land in Grant County, Oregon. After the fire unexpectedly spotted to private land because of an unpredictable wind event, the Grant County District Attorney (the "State") charged him with reckless burning, a Class A misdemeanor under Oregon law.

Mr. Snodgrass was charged because the State—or more precisely, the local sheriff—took issue with the Forest Service's decision to conduct the prescribed fire. But the State cannot charge Mr. Snodgrass with a crime simply because it disagrees with the Forest Service's

decision. The Supremacy Clause controls, and Mr. Snodgrass is immune from prosecution. This case must be dismissed.

## FACTUAL BACKGROUND

### I.     The Forest Service's Use of Prescribed Fires to Manage Wildfire Danger.

The Forest Service, an agency of the United States Department of Agriculture, manages over 190 million acres of land in the United States. *See* https://www.fs.usda.gov/about-agency/meet-forest-service (last visited May 8, 2024). The mission of the Forest Service is to manage and protect the nation's forests and grasslands. *Id.*; *see also* 16 U.S.C. § 6501 (the Healthy Forest Restoration Act which allows for prescribed burns). As part of that mission, the Forest Service frequently engages in what it calls "prescribed" fires or burns. *See* 36 C.F.R. § 211.5 (authorizing Forest Service to render aid if a prescribed fire escapes onto private land); 36 C.F.R. § 293.3 (granting the Chief of the Forest Service the ability to prescribe measures necessary to control fire, insects, and disease, and to take measures in emergencies involving the health and safety of persons or damage to property). These prescribed burns are currently part of a ten-year year plan, established in 2022, by the Forest Service to manage the growing danger posed by wildfires; the Forest Service has made clear that the United States is currently in a wildfire crisis. *See Confronting the Wildfire Crisis* available at https://www.fs.usda.gov/sites/default/files/Confronting-Wildfire-Crisis.pdf (last visited May 8, 2024).

Prescribed burns involve "the controlled application of fire by a team of fire experts under specified weather conditions to restore health to ecosystems that depend on fire." *See* https://www.fs.usda.gov/managing-land/prescribed-fire (last visited May 8, 2024). By using

MOTION TO DISMISS                                                          Page 2 of 14

prescribed burns, the Forest Service not only improves habitats and removes invasive species, but also "reduce[s] the risk of unwanted wildfires in the future." *Id.*

Prescribed burns are based on "burn plans" that are written by specialists and incorporate the considerations of multi-disciplinary teams. "Burn plans identify—or prescribe—the best conditions under which trees and other plants will burn to get the best results safely." *Id.* Burn plans consider a variety of important factors specific to the area, including weather, fuel moistures, topography, the type of fuel present in the burn area (unit), required staffing, complexity analysis, and other conditions. *See* Declaration of Sally Christensen ("Christensen Decl.") at ¶ 3. These conditions are run through various computer models to provide appropriate parameters for a prescribed burn at the specific location. *Id*. These results are reviewed and validated again by experienced federal personnel and, if appropriate, incorporated in the burn plan. *Id*.

No later than 24 hours before the prescribed burn, Forest Service management and burn team leaders must convene an ignition authorization briefing. *See National Prescribed Fire Program Review*, Office of the Chief of the U.S. Forest Service, at 17-19 (Sept. 2022) ("Fire Program Review").[1] The meeting involves a robust review of critical elements of the burn plan, including weather conditions, drought impact, fuel density, and staffing issues, to ensure that the conditions are appropriate for the prescribed burn and that the burn plan's objectives will be met safely. *Id.*; *see also id.* Appendix C at 4-5. At the conclusion of that meeting, the Burn Boss and Fire Management Officer must recommend whether the prescribed burn should go forward and then the appropriate Forest Service agency administrators—in this case, the Malheur National

---

[1] Available at https://www.frames.gov/documents/usfs/USFS_20220908_National-Prescribed-Fire-Program-Review.pdf (last visited May 8, 2024).

Case 6:24-cr-00100-HL   Document 13   Filed 05/10/24   Page 4 of 14

Forest Supervisor, with the concurrence of the Blue Mountain District Ranger[2]—make the decision whether to proceed with the prescribed burn as outlined in the burn plan. Christensen Decl. at ¶¶ 4-6. Upon receiving that authorization, a Burn Boss—with the assistance of a Firing Boss, a Holding Boss, and numerous other professionals—carries out the agency administrator's directive. *See* https://deschutescollaborativeforest.org/meet-the-firefighters/ (last visited May 9, 2024).

Following the meeting, and before a prescribed burn is carried out, the Burn Boss must test conditions at the location to ensure that conditions are consistent with those discussed in the Administrator Ignition Authorization Meeting. The Burn Boss must complete a "Go/No-Go Checklist" and perform a test fire. *See* Christensen Decl. at ¶ 7. If, after testing and review, all the conditions at the location of the burn are consistent with those discussed at the meeting, the burn may proceed. *Id*.

On average, the Forest Service ignites about 4,500 prescribed burns each year to treat over one million acres of Forest Service land. *See* https://www.fs.usda.gov/inside-fs/leadership/national-prescribed-fire-program-review-released-video (last visited May 8, 2024). There are, of course, risks associated with conducting prescribed fires. But duly authorized federal authorities, including the Chief of the Forest Service, have concluded that those risks are outweighed by the risks associated with *not* utilizing that tool:

> We can never guarantee that prescribed fires won't escape because there are risks when we use this tool. It's a trade-off we have to take seriously together with communities. The alternative is more large and destructive wildfires like we have seen the past several decades—a result of the combination of overgrown forests, climate change, a growing number of homes in the wildland-urban interface, and more than a century of fire suppression.

---

[2] The Blue Mountain Ranger District is one of three districts within the Malheur National Forest.

MOTION TO DISMISS                                                    Page 4 of 14

Fire Program Review at 3 (statement of Forest Service Chief Randy Moore).

    **II.       The Star RX Prescribed Burn 2022.**

This case arises out of a prescribed burn—the Starr RX Prescribed Burn 2022—conducted by the Forest Service on October 19, 2022, on the Malheur National Forest in Grant County. Mr. Snodgrass was the Burn Boss for the fire; he oversaw a prescribed burn that was authorized by the Malheur National Forest Supervisor and the Blue Mountain District Ranger. *See* Starr RX Prescribed Burn Plan 2022 ("Burn Plan"), included as Exhibit 1 to the Christensen Decl.[3] Prior to authorizing the fire, the Malheur National Forest Supervisor, the Blue Mountain District Ranger, Mr. Snodgrass, and other Forest Service employees participated in the Ignition Authorization meeting. *See* Christenson Decl. at ¶¶ 5-6. During this meeting, they discussed all the key items and evaluated the risks of the fire. *See id.* The prescribed burn was recommended for implementation by Mr. Snodgrass and the Fire Management Officer and authorized by the Forest Supervisor, Craig Trulock, and the District Manager, Sally Christensen. *Id.*; *see also* Burn Plan at 3-4.

Following the meeting, Mr. Snodgrass and the Burn Boss Trainee oversaw the testing and confirmed that the conditions at the burn site were consistent with those discussed in the ignition meeting. Christensen Decl. at ¶ 7-8. Mr. Snodgrass recorded this on the "Go/No Go Checklist," reported the results to his supervisors via dispatch, and confirmed the prescribed fire could be carried out according to the Burn Plan. *Id.* at ¶ 8. Once the fire was lit, it progressed as expected and was meeting the Burn Plan objectives through the morning and early afternoon. *Id.* at ¶ 10.

---

[3] Because of safety concerns, the Burn Plan has been redacted to remove names and contact information.

MOTION TO DISMISS

Late in the afternoon however, sudden unforeseen high winds caused the fire to spot over onto adjacent private land. *Id*. The burn crew was able to control the fire within approximately an hour, but not before roughly eighteen private acres sustained burn damage. *Id.* No people or livestock were injured. *Id.*

During the prescribed fire, Mr. Snodgrass was employed by the Forest Service and doing his job. *Id*. at ¶ 12. As the Burn Boss, Mr. Snodgrass was authorized by the Forest Service to facilitate the prescribed burn. *Id.* He did so by following the Burn Plan and responding to issues as they arose. *Id.*

Even though Mr. Snodgrass was conducting a prescribed burn as authorized and directed by the Forest Service, the Grant County Sheriff arrested Mr. Snodgrass before conducting any investigation into the circumstances of the fire. *See* Transcript from Body Camera Footage of Arrest of Mr. Snodgrass ("Arrest Tr.") at 11-12 (Sheriff McKinley indicates it may be a criminal investigation), included as Exhibit 1 to the Declaration of Amy E. Potter ("Potter Decl."); *see also* Arrest Tr. at 14-15 (Sheriff asks if homeowners want Mr. Snodgrass prosecuted because he is "willing to arrest him at this point, okay, because he's the burn boss who made the call" and arrests him for reckless burning); *id.* at 16 (indicating that the fire could be careless). This action removed Mr. Snodgrass, the leader of the prescribed burn, from his crew in the middle of its active effort to extinguish the fire. *Id.* at 12-13. Over a year later, on February 2, 2024, Mr. Snodgrass was indicted by a Grant County grand jury for Reckless Burning in violation of ORS 164.335, a class A misdemeanor. He promptly removed the case to this Court.

///

///

///

## ARGUMENT

**I.    Sovereign Immunity Is a Defense to State Criminal Charges Against Federal Employees.**

The Supremacy Clause provides that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state" except to the extent that Congress expressly provides to the contrary. *Hancock v. Train*, 426 U.S. 167, 178 (1976). The Supremacy Clause was designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. 316, 317 (1819).

The Supremacy Clause protects not only the activities of the federal government, but also the actions of individual federal officers who are acting within the scope of their employment. *See Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006) ("Although the Supremacy Clause explicitly refers only to the 'Constitution' and 'Laws,' its implication is that states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws.")

Federal employees are immune from state court prosecution when the prosecution is based on activities performed in the scope and course of duty where the officer's conduct was "necessary and proper." *In re Neagle*, 135 U.S. 1 (1890). "[B]y providing immunity from suit rather than a mere shield against liability, the defense of federal immunity protects federal operations from the chilling effect of state prosecution." *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

MOTION TO DISMISS                                                                 Page 7 of 14

## II.     A Motion to Dismiss Based on Sovereign Immunity May Be Decided at Pretrial.

Supremacy Clause immunity is an absolute defense to state criminal charges, and it may be raised pretrial through a motion to dismiss. *See* Fed. R. Crim. P. Rule 12(b); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988). When raised in the context of a 12(b) motion to dismiss, the reviewing court must view the evidence in the light most favorable to the non-moving party. *Tantella*, 374 F.3d at 148.

But, once immunity is raised, the State bears the burden of "com[ing] forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was . . . doing no more than what was necessary and proper for him to do in the performance of his duties." *Long,* 837 F.2d at 752 (emphasis in original). The State cannot meet its burden "merely by way of allegations." *Tantella*, 374 F.3d at 148. A district court should grant the motion in the absence "of an affirmative showing by the state that the facts supporting the immunity claim are in dispute." *City of Jackson v. Jackson,* 235 F. Supp. 2d 532, 534 (S.D. Miss. 2002).

## III.     Mr. Snodgrass is Immune From State Prosecution.

"[T]he Supremacy Clause prohibits a state from punishing, whether by local prosecution or private suit under state law, (1) a federal officer; (2) authorized by federal law to perform an act; (3) who, in performing the authorized act, did no more than what the officer subjectively believed was necessary and proper; and (4) that belief was objectively reasonable under the circumstances." *Texas v. Kleinhart*, 855 F.3d 305, 314-15 (5th Cir. 2017); *see also Long*, 837 F.2d at 744 (holding that federal officers are immune from state prosecution if "(1) the federal agent was performing an act which he was authorized to do by the law of the United States and

(2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do").

Mr. Snodgrass meets all requirements for immunity for these State criminal charges. He was arrested and charged because he was doing his job and serving as the Burn Boss during a Forest Service sanctioned prescribed fire, in accordance with a Burn Plan that was authorized and approved by his superiors. The State of Oregon may disagree with the Forest Service's decision to conduct a prescribed fire on federal land in Grant County, but this disagreement cannot result in criminal charges against a federal employee doing their job. This is precisely the type of decision that is protected by the Supremacy Clause.

### A. Mr. Snodgrass is a Federal Officer Who Was Authorized to Conduct a Controlled Burn.

The first step for determining whether Mr. Snodgrass is entitled to immunity is to determine whether he was acting within his authority as a federal officer. That requires this Court determine whether an act was "committed within the outer perimeter of the [employee's] line of duty." *Clifton v. Cox*, 549 F.2d 722, 726 (9th Cir. 1977). "'[I]t is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official.'" *Id*. (citation omitted). An act that exceeds an agent's "express authority" will not strip him of immunity. *Id*. at 728. What matters is that the act "occurred in the scope of the employee's regular duties and employment." *Id*. at 728, n.12.

There can be no dispute that at the time of the fire, Mr. Snodgrass was employed with the Forest Service, a federal agency. Christensen Decl. at ¶ 12; *see also* Declaration of R. Snodgrass (Snodgrass Decl.) at ¶¶ 1, 4. And he was acting in his official capacity, as an officer of the United States, while conducting the prescribed burn. Christensen Decl. at ¶ 12; Snodgrass Decl. at ¶ 4.

MOTION TO DISMISS

The Forest Service authorizes its employees to conduct prescribed burns consistent with Forest Service policies. Christensen Decl. at ¶¶ 2-3, 12. Mr. Snodgrass was supervising an approved prescribed burn for the Forest Service when the fire spotted on to private adjacent land. Christensen Decl. at ¶ 12. That is all that is required to find that he was acting within his authority as a federal officer. *See Livingston*, 443 F.3d at 1227-28 (concluding that federal employees were authorized by agency regulations to monitor wolves).

### B.  Mr. Snodgrass' Actions Were Necessary and Proper.

Because Mr. Snodgrass is clearly a federal officer, the next question is whether he reasonably believed his conduct was necessary and proper. To be "necessary and proper," two conditions must be satisfied: (1) the officer must subjectively believe that his action is justified; [4] and (2) that belief must be objectively reasonable. *Clifton*, 549 F.2d at 728; *see also Tanella*, 374 F.3d at 147 (same); *Long*, 837 F.2d at 744 (finding that whether the act is necessary and proper, requires "only that [the agent] reasonably thought it to be necessary and justifiable"); *Tanella*, 374 F.3d at 147 (immunity proper where DEA Agent reasonably believed suspect was reaching for a gun).

For this inquiry, the dispositive issue is Mr. Snodgrass's intent, not the legality of his actions. *Clifton*, 549 F.2d at 728 (holding that defendant need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be"). And his actions are evaluated under the circumstances as they appeared to him at the time. *Id.*; *see also*

---

[4] The *en banc* Ninth Circuit and other courts have questioned whether inclusion of a subjective component is appropriate in light of the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982), which held that qualified immunity should depend on whether the official acted in an objectively reasonable manner, without reference to subjective intentions. *See Idaho v. Horiuchi*, 253 F.3d 359, 366 n.11 (9th Cir.) (*en banc*), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) (*en banc*); *Livingston*, 443 F.3d at 1221. But this Court need not resolve this issue because Mr. Snodgrass subjectively believed his actions were reasonable. Snodgrass Decl. at ¶ 5.

MOTION TO DISMISS

*Tanella*, 374 F.3d at 147 (holding that the "necessary and proper" inquiry "view[s] all of the circumstances as they appeared to" the federal officer at the time of the action at issue).

Mr. Snodgrass participated in the preparation of the Burn Plan that was then vetted and approved by the Forest Service. Christensen Decl. at ¶¶ 4-8. On the morning of the prescribed burn, the leaders of the prescribed burn team recommended that the prescribed burn be approved, and it was approved by Forest Service supervisors, including the Malheur Forest Supervisor and the Blue Mountain District Ranger, after a discussion of key items that could affect the fire. *Id.* at ¶ 6. Mr. Snodgrass and the Burn Boss Trainee oversaw the required pre-burn testing of conditions and recorded those before the fire was lit. *Id.* at ¶ 8. Mr. Snodgrass' job was to carry out the prescribed burn consistent with that plan and the Ignition Authorization. *Id.* at ¶ 9. He did just that and he reasonably believed his actions were necessary and proper. Snodgrass Decl. at ¶ 5.

Mr. Snodgrass' belief that what he was doing was necessary and proper is eminently and objectively reasonable. Mr. Snodgrass acted consistent with a vetted Burn Plan that was reviewed by multiple people, including his superiors. Snodgrass Decl. at ¶ 3-4. Implementing that Burn Plan was reasonable. *See Long*, 837 F.2d at 745 (stating that immunity applies where petitioner "had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable belief" that his actions were necessary and proper) (citation omitted). He reasonably believed his actions were necessary and proper. *See California v. Dotson*, No. 12-cr-0917-AJB, 2012 WL 1904467, at *3 (S.D. Cal. May 25, 2012) ("As long as the Defendant believed his action was reasonably necessary in the performance of his duty it will be deemed necessary and proper.")

MOTION TO DISMISS                                                                Page 11 of 14

The fact that the prescribed burn spotted over to private land does not change the analysis. *Clifton,* 549 F.2d at 727 ("[E]rrors of judgment in what one conceives to be his legal duty will not, alone, serve to create criminal responsibility of a federal officer.") Nor does the fact that the State claims it amounted to a crime. *Cf. Livingston*, 443 F.3d at 1227 ("Supremacy Clause immunity does not require that federal law explicitly authorize a violation of state law.")

"For a federal employee to be stripped of the Supremacy Clause immunity it must be shown that the employee employed means which he cannot honestly consider reasonable in discharging his duties or that the act was made out of malice or with criminal intent." *Dotson*, 2012 WL 1904467, at *3 (*citing Clifton*, 549 F.2d at 728). There is no such allegation here, nor could such an allegation be made in good faith. There is simply no evidence that Mr. Snodgrass acted outside the scope of his job or that he acted unreasonably or maliciously.

The State's real complaint is not with Mr. Snodgrass, but with the Forest Service. The State disagrees with the Forest Service's decision to conduct the prescribed burn on October 19, 2022. When he arrested Mr. Snodgrass that day, Sheriff McKinley told a bystander that he "agree[d] 100 percent" the fire should never have happened. *See* Arrest Tr. at 6. And in grand jury, Sheriff McKinley provided his own theory as to why the burn happened in the first place: "Yeah, and it—I have my theories like it had been a slow year, hadn't been a whole lot going on. They were looking for something to do." [5] *See* Grand Jury Transcript ("GJ Tr.") at 36, included as Exhibit 2 to the Declaration of Amy E. Potter ("Potter Decl.").

---

[5] The State's admission of clearly inflammatory and inadmissible evidence at grand jury violated Oregon law, specifically, ORS 132.230(1), which provides that a grand jury "shall receive no other evidence than such as might be given on the trial of the person charged with the crime in question." If this Court denies Mr. Snodgrass' motion to dismiss based on Supremacy Clause immunity, he reserves the right to file a motion to dismiss based on the State's admission of clearly inadmissible evidence.

The actual evidence of reckless behavior—as opposed to just a policy disagreement—is glaringly absent from the grand jury transcripts and the discovery. The closest the State came was Sheriff McKinley's bald assertion that the Forest Service did not follow their prescribed Burn Plan. GJ Tr. at 13-18. But not only is that statement wrong, it was made without any factual basis. Sheriff McKinley later admitted he that he *had never even seen* the actual Burn Plan applicable to the October 19, 2022, controlled burn, and had instead reviewed "a blank one that is not filled out" from "one [he] pulled offline." GJ Tr. at 14, 39-34.[6] At bottom, the State's argument for criminal liability seems be that because they believe the Forest Service was wrong to engage in a prescribed burn, everyone who was conducting the burn was reckless. But the

---

There are numerous examples of inappropriate and inadmissible "evidence" presented to the Grand Jury, including a mini monologue by Sheriff McKinley opining about how the public perceives him following his arrest of Mr. Snodgrass:

> "So, we're dealing with an internal issue. It's not my job really to do that, but it's brought it to a head, and I would say it's brought a lot to the forefront. Huge national exposure. I don't know if you guys want to know how many hundreds of phone calls I got over this. Either I was a pariah, the enemy, or they're trying to make me a hero out of it."

GJ Tr. at 23.

[6] Sheriff McKinley blamed the Forest Service for the lack of documents. He testified that the State "tried to subpoena all the forest records" but the federal government "refused to cooperate at all." GJ Tr. at 13. He reassured the grand jury that he did "have copies of the refusals from the forest to cooperate in the investigation, you know, their refusal to submit to the subpoena[.]" GJ Tr. at 22. But that was completely inaccurate.

The Forest Service did not refuse to comply. It simply informed Sheriff McKinley that he needed to follow the procedures established by the Supreme Court in *United States ex rel. Touhy v. Ragen et al.*, 340 U.S. 452, 468-69 (1951), to obtain agency documents for court proceedings. The State refused to comply with *Touhy*, and then used the lack of documents to paint the Forest Service and Mr. Snodgrass as obstructionists.

Supremacy Clause simply does not allow local and State officials to substitute their judgment for the judgment of duly authorized federal officials carrying out their official functions.

To the extent the State's goal in arresting and charging Mr. Snodgrass was to chill federal officials from carrying out federal policy—and it apparently was—it has to some extent succeeded, at least for now. According to media reports, firefighters are now reluctant to serve as federal burn bosses, for fear of arrest. *See* Chilled By a Burn Gone Wild at https://www.kgw.com/article/news/local/the-story/oregon-burn-boss-prescribed-fires-arrest/283-d3782136-c58a-4c20-8162-f186ea22a9e1 (last visited May 8, 2024). This is precisely what sovereign immunity, and the Supremacy Clause, are designed to prevent.

Mr. Snodgrass was a federal employee doing what was necessary and proper to carry out his duties. He is entitled to immunity. This case must be dismissed.

## CONCLUSION

The State's disagreement with the Forest Service's decision to conduct a prescribed burn on October 19, 2022, does not entitle them to charge a federal employee with a state crime for doing his job. Mr. Snodgrass is entitled to immunity. This Court should dismiss this case.

DATED this 10th day of May 2024.

Respectfully submitted,

*s/ Amy E. Potter*
**ANGELI LAW GROUP LLC**
DAVID H. ANGELI, OSB No. 020244
MICHELLE KERIN, OSB No. 965278
AMY E. POTTER, OSB No. 231794
AMANDA A. THIBEAULT, OSB No. 132913
*Attorneys for Defendant Ricky Lane Snodgrass*